Peter L. Vestal (SBN 159440)
pvestal@nvlawllp.com
John A. Kelley (SBN 194073)
jkelley@nvlawllp.com
NIESAR & VESTAL LLP
90 New Montgomery St. 9th Floor
San Francisco, CA 94105
Telephone:  (415) 882-5300
Facsimile:   (415) 882-5400

Attorneys for Plaintiffs
KELLEEN SULLIVAN and ROSS SULLIVAN

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| KELLEEN SULLIVAN and ROSS SULLIVAN,<br><br>Plaintiffs,<br><br>vs.<br><br>STEPHEN A. FINN, an individual; and TRUST COMPANY OF AMERICA, INC., a Colorado corporation,<br><br>Defendants. | Case No. _____<br><br>Complaint for<br>(1)  Breach of Fiduciary Duty by Partner<br>(2)  Breach of Duty by Controlling Shareholder<br>(4)  Aiding and Abetting Breach of Fiduciary Duty<br>(5)  Unfair Business Practices (Cal. Bus. & Prof. Code § 17200 et seq.) |

Plaintiffs Kelleen Sullivan and Ross Sullivan bring this action against Defendants Stephen A. Finn ("Finn") and Trust Company of America, Inc. ("TCA") (collectively, "Defendants"), and allege as follows:

## I.    INTRODUCTION

The Sullivan family has operated Sullivan Vineyards in Napa Valley since the early 1970's.  While engaged to marry Kelleen Sullivan in 2011, Stephen Finn obtained control over the family's business by coercing Kelleen's mother JoAnna to

sell her substantial interest in it.  Finn gained actual majority ownership of Sullivan Vineyards in 2014 through a series of further machinations.  He used his power of control of the business to also establish himself in economic control by loading Sullivan Vineyards up with a crushing debt burden.  For debt vehicles, Finn created a Secured Grid Promissory Note with himself as creditor and Sullivan Vineyards as borrower. He also orchestrated a long-term loan agreement with Silicon Valley Bank with whom he cultivated friendly ties.

By the time the Sullivan family was finally able to wrest control of the business away from Finn in 2015, the damage was done.  Finn and Kelleen's marriage was over, and the family business was in a seriously weakened position.  However, Finn was not through, as he had vowed to bankrupt Sullivan Vineyards if he could not keep it for himself.  After losing voting control, he exploited his economic control by convincing Silicon Valley Bank to refuse to renew the loan agreement and, sell it to him instead.  Finn then moved to foreclose on both the Secured Grid Promissory Note and the Silicon Valley Bank loan, which pushed Sullivan Vineyards into a Chapter 11 bankruptcy in which Finn is the only secured creditor.

If the enormous debt Finn created in his favor through intentional acts designed to entrench his control over Sullivan Vineyards cannot be eliminated, Finn will accomplish his goal of freezing the Sullivan family out from any ownership interest in their family's business, thus destroying the Sullivan family legacy and the valuable asset they have nurtured and grown over the past forty-five years.

## II.    PARTIES

1.    Plaintiffs Kelleen Sullivan and Ross Sullivan (collectively referenced herein as the "Sullivans" or "Plaintiffs"), sister and brother, are individual residents of Napa County, California.

2.     Finn is an individual resident of Colorado.

3.     TCA is a privately owned corporation organized under the laws of the State of Colorado with its principal place of business in Centennial, Colorado.  At all relevant times, Finn owned, and continues to own, a majority of TCA's voting stock.

4.     The Sullivans are informed and believe and thereon allege that Defendants, and each of them, were the agents, partners, servants, employees, representatives, co-conspirators and/or alter egos of each of the other Defendants, and, in doing the things alleged herein, were acting within the scope of their authority as such agents, partners, servants, employees and/or representatives with the permission and consent of each of the other Defendants.

## III.    JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

6.     This Court has personal jurisdiction over Defendants Finn and TCA because they have purposefully availed themselves of this forum by committing wrongful intentional acts in this District expressly aimed at the Sullivans, whom they know are residents of this District, and they caused harm to the Sullivans in this District.

7.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

## IV.    INTRADISTRICT ASSIGNMENT

8.     Assignment in the San Francisco or Oakland Division of the United States District Court for the Northern District of California is proper pursuant to Rule 3-2(d) of the Civil Local Rules because a substantial part of the events or

omissions that give rise to the claims herein occurred and are occurring in Napa County, California.

## V.   JUDICIAL ASSIGNMENT

9.   Assignment of this matter to the Honorable William H. Orrick is appropriate pursuant to Rule 3-12 of the Civil Local Rules because: (1) this action concerns substantially the same parties and property as those at issue in *Sullivan v. Finn,* Case No. 16-cv-1948-WHO, and *Finn v. Sullivan,* Case No. 16-cv-5285-WHO; and (2) it is  likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if this case is conducted before a different judge.  Upon filing of this Complaint, the Sullivans intend to file an Administrative Motion to Consider Whether Cases Should Be Related, pursuant to Civil Local Rule 7-11, in *Sullivan v. Finn*, the first-filed action.

## VI.   FACTUAL ALLEGATIONS

### A.   Sullivan Winery Background

10.   James and JoAnna Sullivan began Sullivan Winery (the "Winery") in Rutherford, California in 1972.  They eventually grew their operation to 22 acres of planted vines, and it currently produces around 5,000 cases of wine per year.  The Winery is structured as two closely interrelated businesses: (1) Sullivan Vineyards Corporation ("SVC"), a corporation organized under the laws of the State of California, with its principal place of business in Napa County, California; and (2) Sullivan Vineyards Partnership ("SVP"), a partnership organized under the laws of the State of California.  SVC operates the Winery on real property owned by SVP.

11.   James and JoAnna had five children (collectively the "Siblings" and individually a "Sibling"), including Ross Sullivan and Kelleen Sullivan.  At all

1   relevant times, the Sullivans and their three Siblings have been and continue to be

2   partners in SVP and shareholders in SVC.

3     12. Consistent with its origins, the Winery was historically owned and

4   operated by members of the Sullivan family.  JoAnna became the controlling owner

5   of both SVC and SVP following James's death in 2004.  JoAnna continued to

6   operate the Winery with the assistance of her son Sean Sullivan until approximately

7   2011.  At the beginning of 2011, JoAnna and the Siblings wholly owned SVP, and

8   they owned 97.5% of SVC; a non-family member owned the remaining 2.5% of

9   SVC.

10     13. In 2011, Ross Sullivan phased out of an executive position in a related

11   industry to devote his full time and attention to running the Winery.  From late

12   August 2011 until May 2013, he served as SVC's chief executive officer, at a

13   $100,000 annual salary.  He had several years of experience in vineyard

14   management positions prior to assuming his management role at the Winery and

15   had been involved with vineyards and winery businesses throughout his life.

16     14. Kelleen Sullivan became engaged to Stephen Finn in late 2010, and

17   they planned to marry in June 2011.  At the time of their engagement, Finn was the

18   founder and board chair of TCA, which provides a variety of services and products

19   for registered investment advisors.

20     **B.** **Finn's Purchase of JoAnna's Interest in SVC & SVP**

21     15. While engaged to Kelleen, Finn launched a campaign to acquire

22   controlling interests in SVC and SVP.  He began by repeatedly soliciting JoAnna

23   (then 73) to sell him her interests in the two entities.  Despite Kelleen's entreaties

24   that Finn not badger her mother into selling her interests, Finn ultimately persuaded

25   JoAnna to sign a letter of intent to sell him her interests in SVC and SVP.

26     16. In early 2011 SVC had a loan from Bank of Alameda evidenced by a

27   note secured by a lien on the Winery's inventory (the "<u>Alameda Bank Note</u>").

28

While Finn was in the midst of soliciting JoAnna to sell him her interests in SVC and SVP, he urged her to stop making payments to Bank of Alameda.  Finn told JoAnna she should stop payments and then he would buy the Alameda Bank Note at a discount.  JoAnna was very uneasy about Finn's plan, but Finn said he was about to become her son-in-law and would take care of everything and make things better for all of them.  He then went to the bank and purchased the Alameda Bank Note at a substantial discount.  Apparently, his plan in telling JoAnna to stop making payments on the loan was intended to prompt the bank to consider the note to be distressed.  At the time these events occurred, none of the Siblings knew Finn had purchased the Alameda Bank Note.

17.     Finn and Kelleen married as planned in June 2011 and honeymooned in Europe.  While they were away, JoAnna changed her mind and told Finn she did not want to sell him her interests in SVC and SVP.  While still on his honeymoon, Finn directed his attorneys in San Francisco to respond.  Finn's attorneys sent JoAnna a written letter captioned "Formal Notice of Demand For Payment" dated July 21, 2011 (the "Notice").  The Notice stated that the Alameda Bank Note was past due (as of June 15, 2011), and it demanded payment in full of the principal, accrued interest and unpaid fees, aggregating $386,140.74, plus interest accruing at $60.76 per day running from July 21.   The Notice gave JoAnna eight days to pay in full or face foreclosure.  Confronted with the probable collapse of the Winery due to the threatened foreclosure, JoAnna reluctantly decided to go through with the sale to Finn and signed a Stock and Partnership Interest Purchase Agreement dated August 12, 2011 (the "Purchase Agreement").  JoAnna never revealed to the Siblings that Finn had threatened to foreclose in order to induce her to sell her interests in SVC and SVP.

18.     The Purchase Agreement gave Finn JoAnna's entire 48.57% stock positon in SVC and a 49.9% interest in SVP.  It also granted Finn the option to

Complaint

purchase for $25,000 the remaining 1.1% of SVP that JoAnna still held.  The "minority" interest in SVP was an illusion, created solely to avoid the occurrence of a "tax dissolution" of the partnership; Finn obtained *de facto* control of SVP.  Finn also told the Siblings he had the right to vote the interest in SVC held by his new wife, Kelleen (totaling approximately 10%).

19.    By the end of August 2011, JoAnna had retired and Ross was appointed CEO.  Ross set about making the winery and vineyard operations run more professionally and profitably.  Meanwhile, Finn began to assert his power as a controlling shareholder of SVC; he installed himself as chairman of SVC's board in September 2011, and he appointed David Runberg ("Runberg"), TCA's chief financial officer and a TCA director, as a director of SVC.  TCA's three-member board was thus comprised of Finn, Runberg and Ross, and Finn was thereafter able to control the board's actions at all times until October 7, 2015.

## C.    Silicon Valley Bank Loan; The SVC and SVP Warrants

20.    In the late summer or fall of 2011 SVC and SVP learned of the need to refinance their first secured debt of $6.7 million then held by Hartford Insurance, which had decided to withdraw from agriculture-related financing.  Finn assumed the lead role in the effort to find a new bank, involving Ross in some but not all of the meetings with prospective lenders.

21.    Finn ultimately focused on Silicon Valley Bank ("SVB").  In one meeting Finn and Runberg attended with SVB officers, Runberg remarked that Finn (through his relationship with TCA) would bring SVB $50 million in deposit accounts.

22.    By March 2012, negotiations with SVB resulted in a tentative agreement under which SVB would provide $7.7 million of long-term debt and a $1.5 million line of credit, all secured by a first security position in all SVC and

1  SVP assets to be memorialized in a note and related documents (the "SVB Note").

2  Before final loan documents were prepared, Finn told the Siblings he was going to

3  personally guarantee the SVB loan.  He claimed this would relieve them of any

4  potential personal liability on the SVB debts.  In retrospect, Finn's rationale was

5  untrue, since SVP's partners remained jointly and severally liable for its debts

6  whether or not one partner gave a personal guarantee.  In point of fact, the

7  guarantee was just another step by Finn to take control of SVC and SVP and freeze

8  out the other owners.

9      23.   In March 2012, at Finn's direction, Ross was presented with a set of

10  documents by which the Siblings were given to understand Finn would receive

11  warrants to acquire an additional 25% interest in SVP for $200,000 payable to SVP,

12  and an additional 10% interest in SVC for $50,000 payable to SVC.  By way of

13  explanation, Finn told Ross that SVB wanted him to have the ability to gain greater

14  control over the Winery entities as reassurance to the bank.  However, he assured

15  Ross and the other Siblings he had no intention of ever exercising the warrants.  He

16  also presented a letter to be signed by Ross that said the warrants would lapse if

17  SVC's financial health improved enough for SVB to remove Finn's personal

18  guarantee within two years.  As demonstrated by Finn's subsequent course of

19  conduct, his assurances were untrue, and the statement in the letter was an illusion;

20  Finn intended to, and later did, exercise the warrants, and he had no intention of

21  running the business in a way that would lead to the removal of the personal

22  guarantee.

23      24.   Based on Finn's representations, Ross obtained signatures from the

24  Siblings in late April approving the warrants.  The SVB loan transaction closed in

25  May 2012.

26      25.   In the SVB funding process, Finn was repaid all moneys he claimed to

27  have advanced to or on behalf of SVP and SVC, except for approximately

28

$300,000.  This included a payoff to Finn of the Alameda Bank Note, presumably at par and not at the discounted price he had paid for the note.

26.     From May 2012 to October 2015, Finn increased SVC and SVP's debt to SVB to around $9.6 million.

27.     Finn apparently exercised the warrants in May 2014 and thereafter owned in his own name a majority of the SVP partnership and a majority of SVC's stock.  He did not inform the Siblings that he had exercised the warrants.  Ross only found out much later, when the Winery's tax accountant learned about the change in Finn's ownership position in the course of preparing the Winery entities' tax returns.

**D.     Finn's Grid Note Loan to SVC and SVP**

28.     The Purchase Agreement between Finn and JoAnna also provided for Finn to loan up to $500,000 to the Winery entities.  In effectuation of this term, SVC and SVP executed a Subordinated Secured Grid Promissory Note dated May 17, 2012 (the "Grid Note"), for Finn's benefit.  Ross executed the Grid Note on SVP's behalf, and Runberg executed it on SVC's behalf.  Finn signed to indicate his agreement and acceptance.

29.     A Written Consent of the SVP partners, signed by Finn and Ross on the same day as the Grid Note, explicitly provided that a partner, other than Finn, was required to request an advance from Finn to be added to the Grid Note. Likewise, an Action by Unanimous Written Consent of SVC's board specified that an advance had to be requested by one of SVC's "Authorized Officers" (other than Finn), defined as the Chairman of the Board, the President and the Chief Financial Officer.

30.     SVP's partners (exclusive of Finn) approved the Written Consent because they understood: (1) the Grid Note capped total loan advances at $500,000, consistent with the language of the Purchase Agreement; and (2) the requirement

1   for Authorized Officers to approve loan advances would also require a Sibling

2   partner to approve the advances and thus serve as an important governance tool to

3   ensure the Winery entities used the Grid Note responsibly.  Ross, in his capacity as

4   an SVC director, likewise approved the Written Consent of SVC's board based on

5   the same understanding of the Grid Note terms as the SVP partners.

6        31.    Finn made representations to SVC and SVP's other owners that

7   supported their understanding of the Grid Note terms.  He also assured them that

8   agreements were in place requiring all Grid Note advances to be approved by them.

9   They relied on Finn's assurances and representations in deciding to approve the

10  Grid Note, but the assurances and representations were untrue.  It was not explained

11  to them, and they were unaware, that: (1) the Grid Note itself, which was prepared

12  by Finn and his attorneys, actually lacked any borrowing cap language; and (2) the

13  Authorized Officers requirement in fact placed borrowing authority with respect to

14  SVC in the hands of individuals who would be appointed by, and report to, Finn.

15  Moreover, it later turned out there were no "agreements in place" by which Grid

16  Note advances required the approval of SVC and SVP's disinterested owners other

17  than JoAnna's Purchase Agreement and the Written Consents.

18       32.    The Grid Note was subordinated to the SVB Note.  Ross and SVC and

19  SVP's other owners (exclusive of Finn) understood this to simply mean that

20  repayment of the SVB Note took priority over repayment of the Grid Note.  They

21  were not sophisticated enough to appreciate that, if they were ever required to

22  refinance the SVB Note, they would need to convince Finn to accept a new

23  subordination agreement with the new lender.

24       33.    The Grid Note was not properly approved on behalf of SVC by a

25  disinterested board of directors, or by a majority of disinterested shareholders, and

26  it is therefore voidable as to SVC pursuant to section 310 of the California

27  Corporations Code.

28

34.   SVP's partners approved the Grid Note, but their approval required that a disinterested partner (i.e., a partner other than Finn) approve each advance. Finn, as the controlling partner, was a fiduciary and subject to the obligation of the utmost good faith and fair dealing when transacting business with the partnership. He could not unilaterally approve the Grid Note or any other financial transaction between the partnership and himself.  He had to obtain the other partners' agreement after they were fully informed and had the opportunity to consider the transaction's potential benefit and/or harm to the partnership.  This did not happen. The Grid Note is thus voidable as to SVP.

35.   Over a period of less than three years after May 2012, Finn caused SVC and SVP to become indebted to him under the Grid Note in a claimed amount of approximately $4.6 Million.  During that time, Ross approved advances totaling approximately $480,000, less than the $500,000 loan cap the Siblings understood applied to the Grid Note.  Angelica de Vere ("de Vere"), whom Finn installed as SVC's chief executive officer in May 2013, and whom he later appointed as an SVC board member, approved at least $2.5 million in advances at Finn's direction allocated between both SVC and SVP.  In some cases, Doug Thaxton ("Thaxton"), acting at the direction of and on behalf of Finn, instructed de Vere to sign approvals for Grid Note advances.  At all relevant times mentioned herein, Thaxton was and is a TCA director and president of Gemisys Corporation, a TCA-affiliated company owned by Finn.  For example, in July 2015, Thaxton retroactively obtained approval documentation from de Vere for a number of Grid Note advances that Finn claimed to have made.

36.   Of the more than two dozen Grid Note approvals in SVC and SVP's possession, all but one was made pursuant to the section in the Purchase Agreement in which Finn agreed to loan up to $500,000 to the Winery entities.

Niesar & Vestal LLP
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

Complaint

37.     Some $2.6 million of the total Grid Note advances were allocated to SVP.  Other than Ross, no other disinterested SVP partner approved any Grid Note advances.  The Sullivans are not aware of any Authorized Officers of SVC who approved Grid Note advances other than Ross and de Vere.  The Siblings did not know about the excessive advances until sometime after June 2015.

38.     The Grid Note was never approved in compliance with the requirements of Corporations Code section 310 with respect to SVC, or by SVP's partners.  Consequently, each advance had to be approved by a disinterested board or a majority of SVC's shareholders and a partner, other than Finn, of SVP; those advances which did not comply with the statutory requirements of section 310 are voidable.

**E.     Grid Note-Related Losses Taken by Finn**

39.     Finn caused SVP to report on its 2013 and 2014 tax returns that it had paid interest on the Grid Note.  He did this as part of a tax-planning strategy so SVP could issue Form K-1s to him supporting the deductions he claimed on his personal tax returns arising from SVP losses.  The Sibling partners were unable to access SVP's books and records until October 2015.  Once they did so, they discovered that SVP had not issued Form 1099s to Finn for each of the 2013 and 2014 tax years when he received SVP Form K-1s to support his claims of deductions on his personal tax returns.  Further review of the accounting records failed to reveal any indication SVP had made any interest payments.  Under the circumstances, the Sibling partners felt they had no option but to file amended 2013 and 2014 tax returns because it seemed likely SVP had not made any interest payments on the Grid Note during those years.

40.     Based on the SVP business and financial records available to the Siblings that were created while Finn was in charge, Finn falsely claimed deductions in connection with fictitious interest payments and thereby potentially

exposed SVP to IRS sanctions for committing tax fraud.  To the extent SVP did in fact pay interest on the Grid Note in 2013 and 2014:  (1) Finn improperly allocated a disproportionate amount of the available deductions to himself to the detriment of his partners, including the Sullivans; and (2) Finn violated the terms of the SVB Note, which prohibited him from receiving any payments with respect to the Grid Note until the SVB Note was fully paid.

### F.    Finn's Management of the Winery

41.    While in a position of control over SVC and SVP, Finn habitually concealed critical information from his partners and the other shareholders necessary for them to understand the Winery's business and the increasing risks confronting it.  He also concealed critical information from Ross during the period Ross served as SVC's CEO and at all times while Ross was a director on SVC's board.  For example, Finn did not disclose to Ross that he was engaged in talks with SVB in June 2015 about transferring his ownership interest in the Winery to his nephew.

42.    Finn also failed to keep accurate and complete books and records for SVC and SVP, thereby making it impossible to determine what part of the Winery business, if any, was operating profitably.

43.    Finn terminated Ross Sullivan as SVC's CEO in May 2013 and installed a new management team that was unqualified to manage the Winery.

44.    Finn hired de Vere as SVC's CEO at a salary of $200,000 per year and a 35% bonus.  de Vere had very little prior executive management experience at any winery or vineyard, very little wholesale wine distribution experience, no experience in business finance matters, no vineyard management experience and no experience obtaining grape contracts.  In sum, de Vere lacked the requisite breadth and depth of experience to qualify as the CEO of an operation of the Winery's size and complexity.

45.     de Vere hired Sonyia Grabski ("Grabski") as Vice President of Sales and Marketing at a salary of $130,000 per year, and she received a $15,000 signing bonus.

46.     Finn and de Vere hired Teresa Sullivan (no relation to the Sullivans) in January 2015 as Vice President of Finance & Operations at a salary of $140,000 per year, plus a performance bonus of 25% of base salary.  Teresa Sullivan had prior financial experience involving a winery operation.   However, she had left, or been forced out of, a prior business under a cloud of allegations of financial impropriety.

47.     The Sullivans estimate that the Winery incurred at least $1,300,000 in excess employment-related costs from May 2013 to October 2015 in payments to Finn's management team.  During that time, the management team—led by de Vere, who in turn took instructions only from Finn—produced no benefits to or value for the Winery.  In fact, they caused significant damage to the Winery's business.  For example, in May 2013, the Winery had approximately 1,000 members in its wine club, but the membership had dropped by half when the management team quit in October 2015.

48.     From August 2011 until October 2015, Finn—with active assistance from de Vere starting in May 2013—intentionally and substantially increased SVC's operating costs and undertook massive and unnecessary capital expenditures.  Neither the cost increases nor the capital expenditures materially increased SVC's profitability, and they were made without regard to whether SVC's operating revenues could support the increased costs and debt service.  Consequently, SVC and SVP's long-term debt more than doubled from $6,700,000 to $14,200,000 during that period.  There was no reasonable business justification for doubling the debt.

49.     de Vere hired Beth Matulich ("Matulich") as Wine Club Manager and Trinity Scott ("Scott") as Hospitality Director.

Niesar & Vestal LLP
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

Complaint

50.     During 2014 and 2015, Finn and de Vere engaged architect Jay Jacobson and contractor Craig Songers to plan a complete renovation of the main vineyard residence, which is also Kelleen's home and was the family home where some of the Siblings grew up.  No immediate economic benefit to SVC or SVP would have resulted from such renovations, nor was there a reasonable business justification to undertake the renovation work at that time.

51.     The Finn-Kelleen marriage was in shambles by early 2015. They had entered into a prenuptial agreement, which provided in part that if the marriage ended, Finn's entire ownership interest in SVC and SVP, if any, would transfer to Kelleen.  In February 2015, Finn demanded that she amend the prenuptial agreement so that he could retain his ownership in the Winery entities even if they divorced.  When Kelleen objected to the amendment, Finn threatened to "bankrupt the winery" and "run it into the ground" if she would not agree.  Kelleen never agreed to the amendment.

52.     The actions of Finn's management team in operating the Winery demonstrated incompetence and were actually harmful to the Winery's economic health.  For example, de Vere claimed that the business earned a slight profit in 2015.  That was untrue, in part because a large number of payables were not properly booked (i.e., remained unallocated).

53.     Nevertheless, Finn continued to employ his team and exorbitantly compensate them.  In April 2015, without obtaining the proper and necessary board or shareholder authorization, Finn bestowed new term employment agreements, in place of their previous "at will" employment agreements, on his management team of de Vere, Teresa Sullivan and Grabski.  The new agreements provided them even more excessive salaries, severance payments, and bonus arrangements relative to their experience and job responsibilities.  For example, de Vere received a five-year term agreement at $235,000 per year, a two-year severance payment if SVC

terminated her without cause, and a bonus of 4.8% of the net proceeds realized should the company be sold during that five-year term.  Finn had since installed de Vere as an SVC director, but only Finn approved de Vere's new employment agreement, without approval by an independent board or by SVC's shareholders, and against the advice of SVC's then counsel.  Finn granted the new employment agreements without any reasonable business justification.

54.    In May 2015, Kelleen filed a petition for divorce in the District Court for the City and County of Denver, Colorado (the "<u>Colorado Court</u>"), and she served the petition on Finn on May 27.  The petition included notice of an automatic statutory temporary injunction (the "<u>Colorado Injunction</u>") restraining Finn and Kelleen from *inter alia* transferring, encumbering or in any way disposing of any marital property.

55.    On May 28, 2015, Finn sent the Siblings notice of his intent to list the Winery and its assets for sale for $20,000,000.  Finn also sought to sell the Winery without obtaining the approval of SVP's non-controlling partners or SVC's non-controlling shareholders.

56.    Alarmed, Kelleen asked the Colorado Court to expand the Colorado Injunction, which it did in June 2015.  The expanded injunction specifically restrained Finn from: (1) listing Sullivan Vineyards for sale; and (2) transferring, encumbering, concealing or in any way disposing of Sullivan Vineyards, partnership interests in Sullivan Vineyards Partners and Sullivan Vineyards Corporation, and property or assets of Sullivan Vineyards.  The Colorado Injunction remained in effect at all times through at least March 2016.

57.    In or about July 2015, Finn engaged his personal legal counsel BuchalterNemer PC ("<u>Buchalter</u>") as counsel for both SVC and SVP, despite the fact that Buchalter represented SVB, which was then SVC/SVP's principal bank and personally represented Finn in extensive business transactions.  No minority

Niesar & Vestal LLP
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

Complaint

SVC shareholder or SVP partner was informed of or voted on the retention of Buchalter.  Neither were the minority shareholders and partners informed of the conflicts of interest Buchalter had as a result of such representations, nor was any minority shareholder or partner informed of the extensive business dealings Finn had with Buchalter prior to engaging it as SVC and SVP's corporate counsel.  Buchalter billed in excess of $94,000 to SVC and SVP during the time Finn employed it as their counsel.

58.     On September 1, 2015, de Vere, prompted by Finn, called a special SVC board meeting to consider a proposal to sell SVC and its assets.  de Vere called the meeting without providing adequate notice to Ross and without disclosing to him that de Vere asserted a contractual right to a bonus upon the sale of the assets (and thus was required to abstain from any vote concerning the proposed sale of the Winery assets.)  The purpose of the special meeting also violated the Colorado Injunction.

59.     SVC's three board members, Finn, de Vere and Ross, attended the September 4, 2015 board meeting.  Finn used the meeting as an opportunity to contrive a sham board deadlock, which he then used as a pretext to initiate a lawsuit in Napa County Superior Court wherein Finn sought to have his designee appointed to the board as a provisional director.  He apparently expected his designee would help him obtain board approval to sell the Winery.  Although the court rejected Finn's gambit, SVC's minority shareholders incurred significant costs in legal fees.

60.     On October 7, 2015, the Colorado Court awarded all of Finn's interests in SVC and SVP to Kelleen.  The SVC shareholders immediately met following the Court's oral ruling and removed Finn and de Vere from the board.  However, the damage to the Winery entities was done; Finn left them severely weakened and unable to repay their outstanding loans.  According to both de Vere and Teresa

1  Sullivan, the Winery was in dire financial straits by October 2015; Teresa Sullivan

2  claimed around 70 percent of its debt was more than 60 days past due.

3    61.    On or about October 8, 2015, Finn instructed de Vere to "spend as you

4  wish" notwithstanding his full awareness of the Winery's precarious financial

5  condition.  de Vere, Teresa Sullivan and Grabski began destroying Winery business

6  records such as email messages from their SVC email accounts prior to the October

7  7, 2015 Colorado Court hearing.  The Sullivans are informed and believe and

8  thereon allege that the business records were destroyed at Finn's direction and/or

9  for his benefit in part to prevent detection of Finn's wrongful acts towards SVP's

10  partners and the minority SVC shareholders.

11      **G.    TCA's Involvement in Management of the Winery**

12    62.    TCA's involvement in management of the Winery extended well

13  beyond the facts already mentioned herein.  When Finn became controlling

14  shareholder in August 2011, he announced his decision to keep all the SVC and

15  SVP books and records in Colorado and rely on TCA personnel to maintain them.

16  He, or Runberg acting on his behalf, assigned TCA accountant Rachel Rooney to

17  maintain SVC and SVP's accounting records.

18    63.    TCA employees prepared and signed nearly all checks on behalf of

19  SVC and SVP at TCA's Colorado headquarters.  This business practice prevented

20  Ross, who was SVC's CEO until May 2013, from having any control over cash

21  expenditures or prioritizing payments.

22    64.    Finn appointed TCA CFO and director Runberg to serve on SVC's

23  board as its third director in September 2011.  Runberg did not exercise

24  independent judgment as an SVC director, and he actively endorsed, supported and

25  assisted Finn's management decisions.  After appointing Runberg to SVC's board,

26  Finn instructed him to involve himself extensively in leading the financial activities

27  of the Winery entities, which Runberg did.  Among other actions, Runberg,

28

**Niesar & Vestal LLP**
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

Complaint

1   purporting to be Corporate Secretary, signed a certificate of amendment of SVC's

2   bylaws that was backdated to February 16, 2011, months before his appointment to

3   any position at SVC.

4       65.    David Barry ("Barry") was a TCA director from 2007 until January

5   2016, and he was also TCA's CEO from December 2011 until June 2015.  Barry

6   actively involved himself in SVC's management.  Among other actions, he

7   encouraged Ross's termination as SVC's CEO.  Barry and TCA assisted in Finn's

8   recruitment of de Vere as SVC's new CEO in 2013.  TCA hired executive search

9   firm The Cypress Group to assist with de Vere's hiring, and Barry signed the

10  contract.  Barry also signed de Vere's employment offer letter on SVC's behalf, and

11  he counter-signed de Vere's employment agreement.  Barry also generally asserted

12  authority over SVC's employees, acting as if he were a high-ranking SVC officer.

13      Finn installed Thaxton as SVC's Corporate Secretary around the fall of 2013.

14  In July 2015, Thaxton acted on Finn's behalf to ask de Vere to backdate and sign a

15  packet of approvals relating to Grid Note advances Finn claimed to have made to

16  SVP.

17      **H.**    **Finn's Actions Regarding SVC and SVP Since October 2015**

18      66.    Following the Colorado Court's October 7, 2015 decision, Finn

19  continued to hold himself out as the majority owner of the Winery entities at least

20  through December 2016.  The Sullivans are informed and believe and thereon

21  allege: (1) Finn made these claims at least in part to prevent SVC and SVP from

22  obtaining financing; and (2) Finn's claims accomplished that objective.

23      67.    de Vere and Teresa Sullivan were in Colorado on October 6 and 7,

24  2015, to testify on Finn's behalf during the divorce proceedings.  They never

25  returned to work at SVC.  Grabski, Matulich and Scott called in sick shortly after

26  October 7, 2015 and then quit.

27

28

68.    The Sullivans are informed and believe and thereon allege the following with respect to the lawsuits filed by former SVC employees:

a.    Finn encouraged de Vere, Teresa Sullivan, Grabski, Matulich and Scott to abandon their SVC employment, to falsely allege that they had been wrongfully terminated and to file wrongful termination lawsuits;

b.    Finn intended for the lawsuits to force SVC to incur more legal fees and related costs and to generate a significant contingent liability, thereby impairing its ability to obtain financing; and

c.    Finn has paid all or substantially all of the legal expenses incurred by the plaintiffs in the wrongful termination litigation.

69.    Beginning in the late fall of 2015, the Sullivans actively sought to either renew the SVB Note or to refinance it through another lender.  SVB declined to renew the SVB Note no later than April 2016, stating only that the Sullivans "weren't Finn."  The Sullivans obtained two acceptable proposals from other lenders.  For example, Rabobank, N.A. issued an Expression of Interest in May 2016 that described a senior secured revolving line of credit for $2,500,000 and a senior secured real estate term loan for $7,700,000.  However, SVC and SVP were unable to complete the financing because the lenders expressed concern that Finn still claimed he was the majority owner of the Winery entities, and he would need to agree to subordinate the Grid Note to the new loan.

70.    By April 2016, Finn convinced SVB to decline to renew the SVB Note and instead sell it to him.  This action gave Finn absolute control over SVC and SVP because it both obviated any need for his subordination agreement with SVB with respect to the Grid Note and gave him the power to demand immediate payment of the SVB Note.  The Sullivans are informed and believe and thereon allege that:  (1) Finn used confidential information he obtained while in a fiduciary

relationship with them to persuade SVB not to renew the SVB Note and to sell it to him instead; and/or (2) Finn relied on his history as a fiduciary of the Sullivans to feed false information to SVB under the guise that such information was confidential.

71.     Between May 2015 and the present, Finn has initiated litigation against the Sullivan entities and/or members of the Sullivan family in multiple matters in both state and federal court.  In multiple other matters, one or more Sullivan entities or family members were forced to initiate litigation against Finn.  The Sullivans allege Finn has intentionally used the civil courts in a campaign of attrition to distract the attention of the Winery's owners, including the Sullivans, and drain their resources.  The legal expenses incurred by SVP, SVC and Sullivan family members in litigation with Finn through September 2017 are at least $1,545,000. Of this, Kelleen recovered some $540,000 from Finn in the Colorado divorce proceedings, but only after filing a motion to hold him in contempt.  ($85,000 of the legal expenses incurred to date stem from the wrongful termination suits filed by de Vere, Teresa Sullivan, Grabski, Matulich and Scott and have been paid for under a reservation of rights by SVC's carrier.)

72.     Finn and his newly created company Winery Rehabilitation, LLC initiated non-judicial foreclosure proceedings against SVC and SVP with respect to the SVB Note and the Grid Note in the summer of 2016.

73.     In September 2016, Finn filed an action in this Court (Case. No. 16-cv-05285-WHO), seeking a declaration that he maintained a majority interest in SVC and SVP.   The Court dismissed the matter with prejudice in January 2017 after finding Finn's claims barred by judicial estoppel; it found Finn had stated in the Colorado divorce proceedings that his ownership interests in the Winery had transferred to Kelleen due to the Colorado Court's October 7, 2015 decision.  In addition to the dismissal, the Court's order also prohibited Finn and any entities in

which he had a controlling interest, including Winery Rehabilitation, LLC, from foreclosing on the Sullivan Vineyards property.

74.     Finn's actions to foreclose on the SVB Note and the Grid Note, to prevent SVC and SVP from obtaining new financing, to engage in expensive litigation, and to falsely claim ownership of majority interests in SVC and SVP, caused them to file for Chapter 11 bankruptcy in February 2017.

## FIRST CAUSE OF ACTION –
## BREACH OF FIDUCIARY DUTY OWED TO SVP's PARTNERS

(Against Finn)

75.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 74 as though fully set forth herein.

76.     Finn was an SVP partner at all times from August 12, 2011, until at least October 7, 2015.  Finn continued to hold himself out as an SVP partner at least through December 2016.  The Sullivans have been at all times mentioned herein and continue to be SVP partners.

77.     <u>Fiduciary relationship among partners</u>:  Partnership is a fiduciary relationship, and partners may not take advantages for themselves at the expense of their partners.  The fiduciary duties a partner owes to the partnership and the other partners under California law are the duty of loyalty and the duty of care.  Cal. Corp. Code § 16404(a).

78.     <u>Duty of loyalty</u>:  A partner's duty of loyalty to the partnership and the other partners includes the duties to: (a) account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct of the partnership business or derived from a use by the partner of partnership property or information, including the appropriation of a partnership opportunity; and (b) refrain from dealing with the partnership in the conduct or winding up of the

1   partnership business as or on behalf of a party having an interest adverse to the

2   partnership.  Cal. Corp. Code § 16404(b).

3       79.    The scope of the duty of loyalty is not defined solely by Corporations

4   Code section 16404, but rather incorporates the prior law governing partnerships.

5   *Enea v. Superior Court*, 132 Cal. App. 4th 1559, 1564-65 (2005).  Accordingly,

6   acts not squarely prohibited by section 16404(b) may nevertheless constitute a

7   breach of duty of loyalty if they would have been so considered by preexisting law.

8   "Partners are trustees for each other, and in all proceedings connected with the

9   conduct of the partnership every partner is bound to act in the highest good faith to

10  his copartner and may not obtain any advantage over him in the partnership affairs

11  by the slightest misrepresentation, concealment, threat or adverse pressure of any

12  kind."  *BT–I v. Equitable Life Assurance Soc'y,* 75 Cal. App. 4th 1406, 1410–1411

13  (1999) (quoting *Leff v. Gunter,* 33 Cal. 3d 508, 514 (1983)).

14      80.    <u>Duty of care</u>:  A partner's duty of care to the partnership and the other

15  partners in the conduct of the partnership business requires the partner to refrain

16  from engaging in grossly negligent or reckless conduct, intentional misconduct, or a

17  knowing violation of law.  Cal. Corp. Code § 16404(c).

18      81.    <u>Additional duties</u>:  The duties of loyalty and care include and

19  encompass the following additional duties:

20          a.   Duty of confidentiality:  Information received through the

21              fiduciary relationship must be kept confidential.  This duty

22              prohibits partners from disclosing to third parties confidential

23              information of the partnership that is not a matter of general

24              knowledge without the informed consent of the partnership;

25          b.   Duty of disclosure:  This duty requires partners to disclose

26              material information concerning the partnership to the other

27              partners, including conflicts of interest; and

28

c.    Duty of informed judgment:  This duty requires partners to gain sufficient familiarity with the background facts and circumstances to make an informed judgment before acting on behalf of the partnership and the other partners.

82.    Good faith and fair dealing:  California's Revised Uniform Partnership Act of 1994 (the "Act") requires partners to discharge their duties to the partnership and the other partners under the Act or under their partnership agreement and to exercise any rights they may have consistent with the obligation of good faith and fair dealing.  Cal. Corp. Code § 16404(d).

83.    Existence of fiduciary relationship:  A fiduciary relationship existed between Finn and the other SVP partners, including the Sullivans, at all times while Finn was an SVP partner.  Finn owed and continued to owe fiduciary duties to the other SVP partners at all times since October 7, 2015, while he: (1) claimed to be a majority SVP partner; (2) exercised powers and rights as a partner; (3) possessed and misused confidential information and exercised powers and rights he acquired as a partner; or (4) had actual financial control of SVP through his ownership of the Grid Note and later the SVB Note.

84.    Finn wrongfully furthered his own economic interests:  Finn pursued the course of conduct alleged herein at all times to further his own economic interests in a manner calculated to increase his position of power over SVP and the other partners, including the Sullivans, all to their detriment.  Finn intended to destroy the value of their SVP ownership interests in order to render it impossible for the Sullivans to keep the Winery in their family.

85.    Breach of fiduciary duty:  Finn breached the fiduciary duties of loyalty and care he owed the Sullivans, his partners, by and through the foregoing conduct alleged herein.

86.   <u>Breach of obligation of good faith and fair dealing</u>:  In pursuing the course of conduct alleged herein, Finn also breached his obligation to act towards the Sullivans, his partners, in a manner consistent with his obligation of good faith and fair dealing.  Finn's actions at all relevant times demonstrate that he: (1) intentionally acted with a purpose other than that of advancing the best interests of his partners; (2) acted with the intent to violate applicable law with regard to his partners; and (3) intentionally declined to act in the face of a known duty to act, demonstrating a conscious disregard for his duties to his partners.

87.   <u>Damage</u>:  As a direct and proximate result of Finn's breaches of his fiduciary duties and of his duty to act consistent with the obligation of good faith and fair dealing, the Sullivans have suffered, and will continue to suffer, substantial damage in an amount to be proven at trial, but in no event less than $75,000, excluding interest and costs.

88.   <u>Punitive damages warranted</u>:  Finn pursued the course of conduct alleged herein intentionally and maliciously, in reckless and conscious disregard of the Sullivans' financial circumstances and resulting damage to them.  Finn is guilty of oppression, malice or fraud within the meaning of California Civil Code section 3294, thereby entitling the Sullivans to punitive damages in a sum to be determined at trial.

WHEREFORE, the Sullivans pray for relief as set forth below.

### SECOND CAUSE OF ACTION –
### BREACH OF FIDUCIARY DUTY BY CONTROLLING SHAREHOLDER TO SVC's NON-CONTROLLING SHAREHOLDERS

(Against Finn)

89.   Plaintiffs incorporate by reference the allegations of paragraphs 1 through 74 as though fully set forth herein.

//

**Niesar & Vestal LLP**
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

90.     Finn was a controlling SVC shareholder at all times from August 12, 2011, until at least October 7, 2015.  Finn continued to hold himself out as SVC's majority shareholder at least through December 2016.  The Sullivans have been at all times mentioned herein and continue to be SVC shareholders.

91.     <u>Fiduciary duty of controlling shareholder</u>:  A controlling shareholder owes a fiduciary duty of the utmost loyalty to the non-controlling shareholders and to the corporation.  *Jones v. H. F. Ahmanson & Co*., 1 Cal. 3d 93, 108 (1969).  This duty requires controlling shareholders to exercise their ability to control the corporation in a fair, just and equitable manner for the benefit of the corporation and the non-controlling shareholders.  *Id*.

92.     Any use to which the controlling shareholders put the corporation or their power to control the corporation must benefit all shareholders proportionally and must not conflict with the proper conduct of the corporation's business.  *Jones*, 1 Cal. 3d at 108; *Stephenson v. Drever*, 16 Cal. 4th 1167, 1178 (1997).

93.     A controlling shareholder may not, for example, use the shareholder's power to control corporate activities to benefit the controlling shareholder alone or in a manner detrimental to the non-controlling shareholders.  *Jones*, 1 Cal. 3d at 108.  Likewise, forcing the corporation to pay off shareholder loans, for the purpose of injuring the corporation (leaving it without sufficient capital to continue in business), breaches the controlling shareholder's fiduciary duty to non-controlling shareholders.  *Thrasher v. Thrasher*, 27 Cal. App. 3d 23, 27 (1972) (husband acted to reduce value of shares owned jointly with wife after marital breakup).

94.     Control shareholders may not manipulate the corporation for their own self-interest, without regard to the interests of the non-controlling shareholders or corporate creditors.  If they cause corporate action that disadvantages the non-controlling shareholders or the creditors, they may be held personally liable for the losses sustained.

Complaint

**Niesar & Vestal LLP**
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

95.   <u>Existence of fiduciary relationship</u>:  A fiduciary relationship existed between Finn and SVC's non-controlling shareholders, including the Sullivans, at all times while Finn was a controlling SVC shareholder.  Finn owed and continued to owe fiduciary duties to the other SVC shareholders at all times since October 7, 2015, while he:  (1) claimed to own a majority interest in SVC; (2) exercised powers and rights of a controlling shareholder and director; (3) possessed and misused confidential information and exercised powers and rights he acquired as a controlling shareholder and director; or (4) had actual financial control of SVC through his ownership of the Grid Note and later the SVB Note.

96.   <u>Finn wrongfully furthered his own economic interests</u>:  Finn pursued the course of conduct alleged herein at all times to further his own economic interests in a manner calculated to increase his position of power over SVC and its non-controlling shareholders, including the Sullivans, all to their detriment.  Finn intended to destroy, or so badly impair, the value of their SVC ownership interests in order to render it impossible for the Sullivans to keep the Winery in their family.

97.   <u>Breach of fiduciary duty</u>:  Finn breached the fiduciary duty he owed the non-controlling shareholders, including the Sullivans, by and through the foregoing conduct alleged herein.

98.   <u>Damage</u>:  As a direct and proximate result of Finn's breach of his fiduciary duty as a controlling shareholder to SVC's other shareholders, the Sullivans have suffered, and will continue to suffer, substantial damage in an amount to be proven at trial, but in no event less than $75,000, excluding interest and costs.

99.   <u>Punitive damages warranted</u>:  Finn pursued the course of conduct alleged herein intentionally and maliciously, in reckless and conscious disregard of the Sullivans' financial circumstances and resulting damage to them.  Finn is guilty of oppression, malice or fraud within the meaning of California Civil Code

Complaint

**Niesar & Vestal LLP**
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

section 3294, thereby entitling the Sullivans to punitive damages in a sum to be determined at trial.

WHEREFORE, the Sullivans pray for relief as set forth below.

### THIRD CAUSE OF ACTION – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

(Against TCA)

100.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 74 as though fully set forth herein.

101.    Existence of fiduciary relationship with SVP partners:  A fiduciary relationship existed between Finn and the other SVP partners, including the Sullivans, at all times while Finn was an SVP partner, such that Finn owed fiduciary duties of loyalty and care towards the Sullivans.  Finn was also required to act towards the Sullivans, his partners, in a manner consistent with his obligation of good faith and fair dealing.  Finn owed and continued to owe fiduciary duties to the other SVP partners at all times since October 7, 2015, while he:  (1) claimed to be a majority SVP partner; (2) exercised powers and rights of a partner; (3) possessed and misused confidential information and exercised powers and rights he acquired as a partner; or (4) had actual financial control of SVP through his ownership of the Grid Note and later the SVB Note.

102.    Existence of fiduciary relationship with SVC's non-controlling shareholders:  A fiduciary relationship also existed between Finn and SVC's non-controlling shareholders, including the Sullivans, at all times while Finn was in a controlling shareholder position.  Finn owed and continued to owe fiduciary duties to the other SVC shareholders at all times since October 7, 2015, while he: (1) claimed to own a majority interest in SVC; (2) exercised powers and rights of a controlling shareholder; (3) possessed and misused confidential information and exercised powers and rights he acquired as a controlling shareholder and director;

Niesar & Vestal LLP
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

Complaint

or (4) had actual financial control of SVC through his ownership of the Grid Note and later the SVB Note.

103.   <u>Finn breached his fiduciary duties</u>:  Finn breached the fiduciary duties of loyalty and care he owed the Sullivans, his partners, by and through the foregoing conduct alleged herein.  Finn also breached the fiduciary duty he owed the non-controlling SVC shareholders, including the Sullivans, by and through the foregoing conduct alleged herein.

104.   <u>TCA's knowledge of the breaches</u>:  TCA knew that Finn's actions alleged herein constituted breaches of his fiduciary duties to the SVP partners and the non-controlling SVC shareholders.

105.   <u>TCA assisted Finn</u>:  TCA, through its high-ranking officers, directors and employees, intended to and did in fact provide substantial assistance and/or encouragement to Finn to breach his fiduciary duties to the SVP partners and the non-controlling SVC shareholders by and through the foregoing conduct alleged herein:

106.   <u>TCA's conduct was a substantial factor</u>:  TCA's conduct was a substantial factor in causing harm to the Sullivans.

107.   <u>Damage</u>:  As a direct and proximate result of the substantial assistance and/or encouragement provided by TCA to Finn, the Sullivans have suffered, and will continue to suffer, substantial damage in an amount to be proven at trial, but in no event less than $75,000, excluding interest and costs.

108.   <u>Punitive damages warranted</u>:  TCA pursued the course of conduct alleged herein intentionally and maliciously, in reckless and conscious disregard of the Sullivans' financial circumstances and resulting damage to them.  TCA is guilty of oppression, malice or fraud within the meaning of California Civil Code section 3294, thereby entitling the Sullivans to punitive damages in a sum to be determined at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WHEREFORE, the Sullivans pray for relief as set forth below.

## FOURTH CAUSE OF ACTION –
## UNFAIR BUSINESS PRACTICES
### (Cal. Bus. & Prof. Code §17200 et seq.)

### (Against All Defendants)

109.   Plaintiffs incorporate by reference the allegations of paragraphs 1 through 74 as though fully set forth herein.

110.   At all times mentioned herein, California Business and Professions Code sections 17200 *et seq.* were in full force and effect and were binding on Defendants, and each of them.  Said sections require Defendants, and each of them, to refrain from engaging in unfair, unlawful, fraudulent and deceptive business practices or acts.

111.   By the facts and claims alleged herein, Defendants, and each of them, have engaged in and continue to engage in unfair, unlawful and fraudulent business practices or acts in violation of California Business and Professions Code sections 17200 *et seq.*

112.   Unfair business practices by Finn:  Finn ordered, induced, directed, encouraged and participated in the unlawful, unfair and fraudulent business practices of the other Defendants, and each of them, knowing the conditions under which the practices were done and/or intending the consequences that ensued.

113.   Finn's breaches of fiduciary duty to the Sullivans alleged herein constitute business practices because they were done repeatedly over a significant period of time, in a systematic manner, to the Sullivans' economic detriment.

114.   Unfair business practices by TCA:  Likewise, TCA's actions, as alleged herein, to aid and abet Finn in breaching his fiduciary duties to the Sullivans also constitute business practices because: (1) TCA's actions occurred under the guise of business services it was ostensibly providing to the Winery

entities; and (2) they were done repeatedly over a significant period of time, in a systematic manner, to the Sullivans' detriment.

115.   <u>Causation</u>:  At all relevant times during the four years preceding the filing of this action, the unlawful, unfair and fraudulent acts of Defendants, and each of them, have directly and proximately caused and will continue to cause the Sullivans substantial injury, including *inter alia* impairment of their use and enjoyment of their SVP and SVC ownership interests and diminution in the value of those ownership interests.

116.   <u>Damage</u>:  The unlawful, unfair and fraudulent practices of Defendants, and each of them, will cause imminent and irreparable harm and injury to the Sullivans, the amount of which will be difficult to ascertain if they continue, and the Sullivans will be without an adequate remedy at law.  The Sullivans are therefore entitled to an injunction enjoining and restraining Defendants, and each of them, their officers, agents, employees, assigns and all persons acting in concert with them, from engaging in further such unfair, unlawful and fraudulent conduct. The Sullivans are also entitled to and do request such other equitable relief as may be warranted by the facts alleged herein.

117.   At all relevant times during the four years preceding the filing of this action, Plaintiffs have suffered, and continue to suffer, damages and request restitution of all monies in an amount according to proof at the time of trial and in excess of the jurisdictional minimum of this Court.

WHEREFORE, the Sullivans pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, the Sullivans request that the Court enter judgment as follows:

//

AS TO THE FIRST, SECOND AND THIRD CAUSES OF ACTION

(1)     For general and special damages in an amount according to proof at
        trial, but in no event less than the jurisdictional minimum of this Court;

(2)     For punitive damages according to proof and as provided by law
        including, but not limited to, California Civil Code section 3294

AS TO THE FOURTH CAUSE OF ACTION

(1)     For injunctive relief, including a temporary restraining order and/or a
        preliminary injunction, against Defendants, pursuant to California
        Business and Professions Code section 17203.

(2)     For restitution of all money or property acquired by unfair
        competition;

(3)     For disgorgement of all money or property acquired by unfair
        competition; and

AS TO ALL CAUSES OF ACTION

(1)     For costs of suit incurred herein;

(2)     For an award of attorneys' fees if allowed by statute or agreement;

(3)     For pre-judgment interest as authorized by law; and

(4)     For such other and further legal and equitable relief as the Court may
        deem just and proper.

DATED:  October 6, 2017                NIESAR & VESTAL LLP


                                       _____/s/_____ Peter Vestal
                                       Peter Vestal
                                       Attorneys for Plaintiffs
                                       KELLEEN SULLIVAN and
                                       ROSS SULLIVAN

Complaint

Niesar & Vestal LLP
90 New Montgomery St.
9th Floor
San Francisco, CA 94105