UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLEEN F. SULLIVAN, et al., <br> Plaintiffs, <br> v. <br> STEPHEN A. FINN, et al., <br> Defendants. | Case No. 3:17-cv-05799-WHO <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT ON THE PLEADINGS** <br> Re: Dkt. No. 70 |

Siblings and plaintiffs Kelleen and Ross Sullivan aim to show that defendant Stephen Finn,[1] Kelleen's ex-husband, breached his fiduciary duty as a fellow shareholder in their family winery, the Sullivan Vineyards Corporation ("SVC") and Sullivan Vineyards Partnership ("SVP"). To pursue their claims, the Sullivans must allege harm that is more than incidental to the harm Finn undeniably caused to SVC and SVP, which settled a bankruptcy case earlier this year. Before me is Finn's motion for judgment on the pleadings of the first amended complaint. As set forth below, I conclude that the Sullivans allege at least some harm that stands apart. Accordingly, I will grant the motion in part and deny it in part.

**BACKGROUND**

**I.  FACTUAL HISTORY**

The Sullivans allege that from 2011 to 2016, Finn took a series of actions to obtain control over SVC and SVP, drive the business into debt, and accrue credit in his favor. The first amended complaint ("FAC") alleges that while Kelleen and Finn were engaged, Finn began harassing

---

[1] The Sullivans also bring claims against Trust Company of America, Inc. ("TCA"), a company in which Finn owns a majority of voting stock. The motion before me makes no distinction between Finn and TCA; accordingly, this Order addresses them as one.

Kelleen and Ross's mother Joanna to sell him her interests in SVC and SVP. FAC ¶ 22. During this time, he convinced Joanna to stop making payments on SVC's loan from the Bank of Alameda ("Alameda Bank Note"), and she did so. *Id.* ¶ 24. Finn then purchased the Alameda Bank Note at a discount. *Id.* While Finn and Kelleen were on their honeymoon, Joanna informed Finn that she would not sell him her interests in the companies; Finn's lawyers then sent Joanna a notice requiring that she pay the principal and fees on the overdue Alameda Bank Note within nine days or face foreclosure. *Id.* ¶ 25. Joanna then agreed to sell Finn her shares in SVC and SVP, giving him a 48.57% interest in SVC and a 49.9% interest in SVP.[2] *Id.* ¶¶ 25-26.

In March 2012, Finn secured a loan from Silicon Valley Bank on behalf of SVC and SVP ("the SVB Note"). *Id.* ¶ 29. Finn misrepresented to Kelleen and Ross that he would personally guarantee the loan, meaning that they would not be personally liable. *Id.* ¶ 30. Instead, Finn's guarantee meant that after Kelleen regained control of Finn's shares after their divorce, she and Ross could not refinance the debt without Finn's approval. *Id.* ¶ 30.

Also in March 2012, Ross approved warrants that would allow Finn to obtain an additional 25% interest in SVP for $200,000 payable to SVP, and an additional 10% interest in SVC for $50,000 payable to SVC. *Id.* ¶¶ 31, 33. Finn assured the Sullivans that he had no intention of exercising the warrants and that they would lapse when the business's financial health improved. *Id.* ¶ 31. In May 2014, Finn exercised the warrants, which gave him a majority interest in both SVC and SVP. *Id.* ¶ 35. Because of Finn's exercise of the warrants, "the interests of Kelly and Ross [in SVC and SVP] were each decreased by almost 10%." *Id.* ¶¶ 36, 37.

On May 17, 2012, SVC and SVP executed a Subordinated Secured Grid Promissory Note ("the Grid Note") for Finn's benefit. *Id.* ¶ 38. Finn led the Sullivans to believe that the Grid Note capped loan advances at $500,000 and that a partner other than Finn would have to approve loan advances from him. *Id.* ¶¶ 40, 41. With these understandings, they approved the Grid Note. *Id.* ¶ 44. Instead, the Grid Note had no cap, and individuals who reported to Finn had the power to authorize borrowing. *Id.* ¶ 41. The Sullivans were not aware that if they wanted to refinance the

---

[2] The Sullivan children did not learn until later that this threat induced Joanna to sell her shares to Finn. FAC ¶ 25.

SVP Note, they would have to secure Finn's approval as to the Grid Note. *Id.* ¶ 42.

Finn used the Grid Note to cause SVC and SVP to become indebted to him in the amount of $4,600,000. *Id.* ¶ 45. This action violated the debt limit of the Purchase Agreement between Joanna and Finn, which capped loans from Finn at $500,000. *Id.* "Finn's actions in violating the debt limit of the Purchase Agreement effectively rendered the ownership interests of Plaintiffs nearly worthless because they were saddled with untenable debt, while his interest remained intact because the debt was owed to him." *Id.* ¶ 45. No disinterested SVP partner approved these advances. *Id.* ¶ 48. Kelleen and Ross were not aware of them until after June 2015. *Id.*

Also under Finn's direction, SVP reported in its 2013 and 2014 tax returns that it had paid interest on the Grid Note. *Id.* ¶ 50. He had SVP issue him K-1s to support deductions on his personal returns. *Id.* The Sullivans did not receive the same benefit. *Id.* In May 2013, Finn fired Ross as SVC's CEO. *Id.* ¶ 60. He gave excessive compensation to an unqualified replacement team. *Id.* ¶¶ 60-66.

On October 7, 2015, the pending divorce between Kelleen and Finn became final, and the Colorado court awarded Finn's interests in SVC and SVP to Kelleen. *Id.* ¶ 70. The SVC shareholders immediately removed Finn from the board, along with an individual he had appointed. *Id.* Despite losing his interest in the companies, Finn "continued to participate in management of SVC and SVP and exercised discretionary authority relating to both," meaning he "continued to have fiduciary duties." *Id.* ¶¶ 71, 79. He told one employee to "'spend as she wished.'" *Id.* ¶ 80. Finn "continued to hold himself out as holding a fiduciary position, in court and in his dealings with financial institutions." *Id.* ¶ 83.

After the divorce, several employees Finn had hired quit their positions within SVC and SVP and then filed wrongful termination lawsuits against the companies at Finn's direction. *Id.* ¶¶ 87-88. Finn paid the employees' legal expenses for those cases. *Id.* ¶ 88. The Sullivans and other family members have been forced to initiate litigation against Finn. *Id.* ¶ 92 (listing litigation costs for which Kelleen has not been reimbursed). Kelleen also incurred legal fees defending against the first suit Finn initiated in this Court. *Id.* ¶ 93.

Despite the Sullivans' attempts to renew or refinance the SVB note, the bank refused,

3

"stating only that Plaintiffs 'weren't Finn.'" *Id.* ¶ 89. In April 2016, Finn convinced SVB to sell the SVB Note to him. *Id.* ¶ 90. In the summer of 2016, Finn initiated foreclosure proceedings against SVC and SVP with respect to the SVB Note and the Grid Note. *Id.* ¶ 91.

## II. PROCEDURAL HISTORY

The Sullivans initiated this case on October 6, 2017. Dkt. No. 1. Finn then moved to transfer the case to bankruptcy court, where the Honorable Roger L. Efremsky was presiding over a matter involving the same nucleus of facts. Dkt. No. 19. On March 8, 2018, I issued a short order on Finn's motion to transfer. Order on Mot. to Transfer [Dkt. No. 41]. After issuing that Order, I referred the case to the Hon. Dennis Montali for settlement. Dkt. No. 42. The parties were not able to reach a global settlement, but eventually Chapter 11 Trustee Timothy Hoffman "negotiated a compromise involving all principal parties in the Bankruptcy Cases save for the Sullivans." Request for Judicial Notice[3] ("RJN") Ex. B [Dkt. No. 51-2], Declaration of Aron Oliner ("Oliner Decl.") ¶ 18. On April 3, 2019, Hoffman filed an application for an order authorizing him to enter into that compromise on behalf of SVC and SVP. RJN Ex. A [Dkt. No. 51-1]. Bankruptcy Judge Roger L. Efremsky issued such authorization on May 20, 2019. RJN Ex. C [Dkt. No. 51-3].

In the settlement, the Trustee, acting on behalf of SVC and SVP, released all claims that were within his power to release: "For the avoidance of doubt, the Trustee is providing the Settling Creditors with the broadest possible release he may provide on behalf of the Estates . . . ." RJN Ex. B[4] ECF p.9–17 ("Settlement Agreement" or "Agreement") 4. The Agreement went on to note, "The Trustee is not releasing any Claims held directly and exclusively by Ross Sullivan or Kelleen Sullivan as individuals but the Trustee is releasing Claims of the Estate that could discharge derivative or indirect claims by Ross Sullivan or Kelleen Sullivan . . . ." *Id.* The parties then

---

[3] Addressing Finn's first motion for judgment on the pleadings, I granted his request for judicial notice of certain documents filed in the parties' bankruptcy proceeding in the United States Bankruptcy Court for the Northern District of California, entitled *In re Sullivan Vineyards Corporation and In re Sullivan Vineyards Partnership*, N.D. Cal. Bankruptcy Court Case No 17-10065-RLE-11.

[4] The Settlement Agreement follows the declaration of Aron Oliner at the same docket entry.

4

United States District Court
Northern District of California

1 stipulated to dismiss with prejudice the adversary bankruptcy proceeding. RJN Ex. D [Dkt. No. 51-4].

On June 12, 2019, Finn filed a motion for judgment on the pleadings, arguing that the complaint alleged no harm distinct from the harm to SVC and SVP. Dkt. No. 50. On September 6, 2019, I denied that motion but dismissed the complaint with leave to amend to allege claims that were independent of the corporations' claims. Dkt. No. 67. The Sullivans filed a first amended complaint ("FAC") on September 26, 2019, and on October 10 Finn moved for judgment on the pleadings. Motion ("Mot.") [Dkt. No. 70].

## LEGAL STANDARD

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) utilizes the same standard as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 n.4 (9th Cir. 2011). Under both provisions, the court must accept the facts alleged in the complaint as true and determine whether they entitle the plaintiff to a legal remedy. *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (citation omitted). Either motion may be granted only when it is clear that "no relief could be granted under any set of facts that could be proven consistent with the allegations." *McGlinchy v. Shull Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988) (citations omitted). Dismissal may be based on the absence of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F. 2d 530, 534 (9th Cir. 1984).

A plaintiff's complaint must allege facts to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the court must accept as true the well-pleaded facts in a complaint, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper motion. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

5

elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnote omitted).

**DISCUSSION**

The Sullivans raise new allegations in support of their claims for breach of fiduciary duty and for aiding and abetting breach of fiduciary duty along with pleading new claims for fraud and intentional infliction of emotional distress ("IIED"). As was true in the last round of Finn's motion, there is no dispute that the Settlement Agreement resolved all claims for damage to SVC and SVP and that it expressly did not release the Sullivans' individual claims, to the extent they exist. *See* Oppo. 7; Reply 6. The question before me is whether the Sullivans have plausibly pleaded individual claims that stand separate and apart from the damages Finn's actions caused to SVP and SVC. Finn also challenges the Sullivans' fraud claim for lack of particularity and Kelleen's new IIED claim for being outside the statute of limitations and for failing to allege any sufficiently outrageous conduct.

### A. Breach of Fiduciary Duty

A shareholder may bring an individual rather than derivative action "only if the damages were not *incidental* to an injury to the corporation." *Nelson v. Anderson*, 72 Cal. App. 4th 111, 124 (1999), *as modified on denial of reh'g* (June 14, 1999). A personal claim "originate[s] in circumstances independent of [the plaintiff's] status as a shareholder." *Hilliard v. Harbour*, 12 Cal. App. 5th 1006, 1015 (Ct. App. 2017), *review denied* (Sept. 13, 2017) (citing *Nelson*, 72 Cal. App. 4th at 124). By contrast, an action is derivative "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets." *Jones v. H. F. Ahmanson & Co.*, 1 Cal. 3d 93, 106 (1969) (internal quotation marks and citation omitted). "[T]he pivotal question is whether the injury is incidental to or an indirect result of a direct injury to the corporation or to the whole body of its stock or property." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

In *Jara*, a California Court of Appeal allowed individual claims to proceed where the

plaintiff alleged "that he was deprived of a fair share of the corporation's profits as a result of defendants' generous payment of excessive compensation to themselves." *Jara v. Suprema Meats, Inc.*, 121 Cal. App. 4th 1238, 1258 (2004) (noting that the defendants admitted on cross-examination that the bonuses were designed to reduce the profits that had to be shared with the plaintiff). Unlike in *Jones*, where the allegedly wrongful conduct "had no effect whatever on the underlying business," the excessive compensation "did have the potential of damaging the business." *Id.* (discussing *Jones*, 1 Cal. 3d at 106). But the plaintiff did not argue the business would have performed better but for the wrongful conduct; instead, his claim was based on his own lack of access to the business's profits. *Jara*, 121 Cal. App. 4th at 1258.

Turning to the instant case, I conclude that some of the Sullivans' theories of breach survive while others do not. The allegations related to the Alameda Bank Note and the warrants cannot proceed because the individual harm alleged is simply too wound up in harm to the business. The Sullivans allege Finn purchased the Alameda Bank Note at a discount allegedly in order to bully Joanna Sullivan into selling her shares. *See* Oppo. 6 (citing FAC ¶ 24). Because this conduct occurred prior to Finn's purchase of Joanna's interests, he was not a shareholder of SVC and SVP and thus owed no fiduciary duty to Kelleen and Ross. The Sullivans also raise Finn's decision to exercise the warrants despite having told them that he would not do so. Although this action allegedly caused each of the Sullivans' interests to go down by almost 10%, there is no individual injury because all of Finn's shares reverted back to Kelleen after the October 2015 divorce. *See* FAC ¶¶ 36, 37; Reply 3. The Sullivans assert that they still experienced an injury because the recovered shares were in a state of diminished value, but that harm is indistinguishable from the harm felt by the body of stock as a whole due to Finn's conduct. These theories fail.

The allegations related to the Grid Note survive in part for two reasons. First, the amended complaint alleges that Finn used SVP's interest payments on the Grid Note to support deductions on his personal tax returns. FAC ¶ 50. He did not allow the Sullivans access to those same tax benefits related to the Grid Note. *Id.* Second, the Sullivans allege that the Grid Note was executed "for Finn's benefit," as was all the borrowing that occurred under it. *See id.* ¶¶ 38, 39;

7

*see also id.* ¶ 45 (noting that "the debt was owed to [Finn]"). For this reason, Finn's conduct stands apart from cases where mere mismanagement of a corporation is alleged: his actions created a debt that was *owed to Finn himself*. It is beyond dispute that Finn's actions harmed the business[5]—which makes this case closer than some the parties have cited—but the Sullivans also allege a distinct harm caused to them. Through both the tax deductions and the credit in his favor, Finn allegedly claimed a benefit for himself without giving the Sullivans access to the same.

The allegations related to attorney fees also survive. The Sullivans assert that Kelleen was forced to pay to defend against sham claims brought at Finn's behest. FAC ¶¶ 87-88, 92. Finn first counters that the American Rule bars Kelleen's recovery of attorney fees. Mot. 10-11. That is wrong. The Sullivans do not seek attorney fees during the course of a case against Finn; rather, they seek money damages for breach of fiduciary duty, as measured by the attorney fees Kelleen paid in previous cases. *See* Oppo. 10. While Finn also criticizes the Sullivans' failure to cite authority showing that attorney fees are recoverable for a breach of fiduciary duty claim, he cites no authority establishing that attorney fees would *not* be recoverable as money damages. *See* Reply 4.

Finn next asserts that he owed the Sullivans no fiduciary duty when the alleged attorney fee damages occurred, because he and Kelleen had divorced and he was no longer a shareholder of SVC and SVP. It is true that there was no obvious fiduciary duty after Finn lost his interests and was removed from his leadership positions within SVC and SVP. But at this stage of the case the Sullivans need not prove that Finn owed them a fiduciary duty; they need only have pleaded a theory under which such a duty survived the divorce.

The FAC pleads that Finn held himself out to financial institutions and employees as retaining his position of authority and control, meaning he still owed a fiduciary duty. FAC ¶¶ 71, 79, 83. In their opposition to Finn's motion, the Sullivans cite cases suggesting they might be able to show a duty "undertaken by agreement." Under California law, there are two types of fiduciary

---

[5] The Sullivans may not proceed with any theories of breach that rely on harm to the business, namely in the form of the diminished value of their shares; only the theories approved here survive.

8

duties: "those imposed by law and those undertaken by agreement." *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 416 (2000), *as modified* (Sept. 14, 2000), *as modified on denial of reh'g* (Sept. 26, 2000), and *disapproved of on other grounds by Reeves v. Hanlon*, 33 Cal. 4th 1140, 95 P.3d 513 (2004). "A fiduciary duty is undertaken by agreement when one person enters into a confidential relationship with another." *Id.* at 417. "Generally, the existence of a confidential relationship is a question of fact for the jury or the trial court." *Barbara A. v. John G.*, 145 Cal. App. 3d 369, 383 (1983).

In *Barbara A.*, the court faced "unique facts" that compelled it to submit to the jury the question of the bounds of a fiduciary relationship. *Id.* at 384. The plaintiff in that case alleged damages stemming from an attorney-client relationship that became sexual. *Id.* at 374-75. The court decided against determining as a matter of law that the attorney owed the client a fiduciary duty with respect to all his relations with her. *Id.* at 384. Instead, the existence of a confidential relationship was "more properly a question of fact for the jury, or court, who [could] better assess whether the legal relationship was dominant or whether the parties functioned on a more equal basis in their personal relations." *Id.*

Here, too, the factual scenario alleged is unusual. The Sullivans assert that Finn maintained influence over SVC and SVP because of the Grid Note, for which he was creditor, and because of his relationship with the Silicon Valley Bank. I need not decide now that the Sullivans will be able to show a fiduciary duty existed; I need only decide based on the complaint whether such a possibility is entirely foreclosed. I cannot conclude that is the case.

For all of these reasons, the Sullivans can proceed with their individual breach of fiduciary duty claims based on the theories set forth above.

### B. Fraud, Aiding and Abetting Fraud, and Unfair Business Practices

Finn moves for judgment on the fraud, aiding and abetting fraud, and unfair business practices causes of action on the same grounds. Because the Sullivans' breach of fiduciary duty claims survive in part, these claims also survive on those same narrow grounds.

### C. Particularity of Fraud Allegations

Finally, Finn argues that the complaint fails to allege fraud with the particularity required

9

by Federal Rule of Civil Procedure 9(b). Instead, according to Finn, the FAC "alleg[es] only in general terms that Finn made certain misrepresentations." Mot. 14.

Rule 9(b) of the Federal Rules of Civil Procedure requires plaintiffs to plead fraud with particularity. FED. R. CIV. P. 9(b). The complaint must identify "the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Bosse v. Crowell Collier & MacMillan*, 565 F.2d 393, 397 (9th Cir. 1973). The information should include "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

The Sullivans allege that Finn made seven fraudulent misrepresentations to them. FAC ¶ 146. He represented that (1) his personal guarantee of the SVB Note would relieve them of personal liability, (2) he had no intention of exercising the warrants, (3) under the terms of the Grid Note an SVP partner other than Finn was required to request advances, (4) under the terms of the Grid Note a disinterested officer of SVC was required to request advances, (5) total advances under the Grid Note were limited to $500,000, (6) other agreements were in place pursuant to which an SVP partner other than Finn was required to request advances under the Grid Note, and (7) other agreements were in place pursuant to which a disinterested officer of SVC was required to request advances under the Grid Note. *Id.* Only some of these allegations include harm that stands apart from the harms to the businesses, but those that survive are sufficient to satisfy the heightened pleading standard for fraud. They allege who (Finn) made what (the specific misrepresentations above), to whom (Kelleen and Ross), and when (May 2012).

**D.     IIED**

The FAC alleges that during their marriage, Finn "engaged in repeated acts of verbal abuse and contempt" toward Kelleen, that he threatened to kill her, that he committed adultery, and that he brought prostitutes into their home. FAC ¶ 139. Finn knew that she was "vulnerable to emotional distress," and his conduct caused her to experience "severe anguish, fright, horror, nervousness, anxiety, humiliation, shock[,] and severe emotional distress" within two years of filing the original complaint and all the way to today. *Id.* ¶¶ 141, 142.

IIED has three elements: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct." *Cochran v. Cochran*, 65 Cal. App. 4th 488, 494 (1998). To meet the first element, the conduct "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (internal quotation marks omitted). No cause of action lies for "'mere insults, indignities, *threats,* annoyances, petty oppressions, or other trivialities.'" *Id.* at 496 (quoting Rest. 2d Torts § 46, com. d). Although outrageous conduct must be assessed on a case-by-case basis, "the appellate courts have affirmed orders which sustained demurrers on the ground that the defendant's alleged conduct was not sufficiently outrageous." *Id.* at 494. No cause of action for IIED lies where feuding in an intimate relationship include "hostile unpleasantries" and death threats not accompanied by steps to carry out those threats or "make [them] appear more real." *Id.* at 498.

Taking Kelleen's allegations as true, I will assume that she has stated a claim for IIED. However, the statute of limitations applies to bar her claim.

The marriage between Kelleen and Finn ended on October 7, 2015, meaning that outrageous acts she describes occurred well prior to that date. The complaint was filed October 6, 2017. A two-year statute of limitations from California Code of Civil Procedure section 335.1 applies to claims for IIED. *See Pugliese v. Superior Court*, 146 Cal. App. 4th 1444, 1450 (2007). The Sullivans nevertheless argue that the statute of limitations does not bar their claims because "an action for intentional infliction of emotional distress does not accrue until plaintiff has been severely impacted by the emotional distress." Oppo. 13.

The Sullivans rely on *Murphy* to support their argument. In that case, the court noted that "the conduct complained of [was] continuing in nature encompassing a period of several years and the emotional distress alleged [was] also of a continuing nature." *Murphy v. Allstate Ins. Co.*, 83 Cal. App. 3d 38, 51 (1978). Two questions of fact prevented the court from concluding that the plaintiffs' cause of action had accrued at a time that meant the suit was barred. *Id.* First, there was a question over "the point at which the defendant's conduct ha[d] become sufficiently

11

outrageous." *Id.* Second, there was a question over the point at which "the plaintiff's emotional distress [had become] sufficiently severe." *Id.*

Here, the FAC specifically alleges that Finn's conduct occurred during the course of his marriage to Kelleen, so the former question of fact is not present. And it is not plausible that her alleged severe emotional distress did not arise prior to the day her divorce became final. In this regard, the Sullivans' reliance on *Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 802 (2011) is entirely unpersuasive. There, the Supreme Court of California determined that a claim was not barred as a matter of law insofar as it was based on a distinct disease that in fact surfaced within the statute of limitations period. *Id.* By contrast, claims based on the diseases that had been diagnosed earlier were barred. *Id.* at 801, 796. Although smoking had caused all of the alleged injuries, plaintiff could not have been expected to sue for damages related to a disease prior to that disease surfacing. *See id.* at 802. By contrast here, the same alleged conduct caused Kelleen the same alleged injury, namely severe emotional distress. *See id.* at 801 (emphasizing that "the injuries arose at different times and were separate from one another"). Accordingly, an IIED cause of action accrued prior to two years before the date of the original complaint. Finn is entitled to judgment on the IIED claim.

## CONCLUSION

For these reasons, Finn's motion is GRANTED as to the IIED claim. It is DENIED as to the remaining claims. The Sullivans may proceed only on the theories approved herein.

A Case Management Conference is set for January 14, 2020 at 2 p.m. A Joint Case Management Statement shall be filed no later than January 7, 2020, setting forth a proposed calendar for case through trial and raising any other issues that may impede (or enhance) an expeditious resolution of this matter.

**IT IS SO ORDERED.**

Dated: December 4, 2019

William H. Orrick
United States District Judge